**Linda S. DOWDY Plaintiff**

v.

**HARTFORD LIFE & ACCIDENT INSURANCE COMPANY and American Household Inc., Administrator of the Group Long–Term Disability Plan for Employees American Household Inc. Defendants**

**No. 2:05 CV 82 KS MTP.**

United States District Court, S.D. Mississippi, Hattiesburg Division.

Oct. 11, 2006.

Ray Price, Hattiesburg, MS, for Plaintiff.

Steven H. Begley and Kevin A. Rogers, Jackson, MS, for Defendants.

## MEMORANDUM OPINION AND ORDER

STARRETT, District Judge.

This cause is before the court on a motion for summary judgment filed by defendant Hartford Life & Accident Insurance Company ("Hartford"). From its review of all matters made a part of the record of this case as well as applicable law, and being thus fully advised in the premises, the court FINDS that the motion is well taken and should be granted. The court specifically finds as follows:

### FACTUAL BACKGROUND [1]

Plaintiff Linda Dowdy was employed as a human resources representative by American Household Inc., formerly Sunbeam Corporation ("American") from September 1986 until she stopped working on January 15, 2000. Ms. Dowdy was a participant in an employee welfare benefit plan established, maintained and administered by American (the "Plan") and funded by a Group Long Term Disability Insurance Policy No. GLT–043198 issued by Hartford (the "Policy"). In March 2005, Ms. Dowdy filed a complaint against Hartford and American [2] challenging the discontinuation of her long-term disability benefits. In her complaint, plaintiff seeks to recover benefits allegedly due under the Plan, as well as to clarify her future right

---

1. These facts are taken from the Policy and Ms. Dowdy's claim file, duly authenticated by the affidavit of Corey M. Welch (Exhibit C to Hartford's motion for summary judgment).

2. American was originally named as a defendant, but was dismissed on December 7, 2005 upon an agreed Stipulation of Dismissal.

to such benefits, pursuant to the civil enforcement provision of ERISA, 29 U.S.C. § 1132.

The Policy sets forth the terms and provisions of the Plan, including the benefits available and the procedures for submitting claims. The purpose of the Policy is to provide eligible employees with loss of income protection in the event of disability from a covered accidental bodily injury, sickness or pregnancy. Under the Policy, Hartford has "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy."

The Policy provides that long-term disability benefits will be paid as follows: "You will be paid a monthly benefit if:

1. you become Disabled while insured under this plan;

2. you are Disabled throughout the Elimination Period;[3]

3. you remain Disabled beyond the Elimination Period;

4. you are, and have been during the Elimination Period, under the Regular Care of a Physician; and

5. you submit proof of loss satisfactory to us."

Under the Policy, the terms "Disability" and "Disabled" are defined as follows: "during the Elimination Period and for the next 12 months you are prevented by

1. accidental bodily injury;

2. sickness;

3. Mental Illness;[4]

4. Substance Abuse; or

5. pregnancy,

from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80 % of your Indexed Pre-Disability Earnings.

After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.

The period of time for which benefits are payable if a participant is disabled because of: "Mental Illness that results from any cause" or "Any condition that may result from Mental Illness" is limited. Such benefits are available:

"1. only for so long as you are confined in a hospital or other place licensed to provide medical care for the disabling condition; or

2. when you are not so confined, a total of 24 months for all such Disabilities during your lifetime."

Ms. Dowdy stopped working at American on January 15, 2000, when she became disabled. On a Disability Report Form dated May 4, 2000 submitted to the Office of Disability Determination Services in Jackson, Mississippi, Dr. Sam Fillingane, Ms. Dowdy's treating physician since December 30, 1999, listed Ms. Dowdy's diagnoses as: 1) Fibromyalgia,[5] 2) Major de-

3. The Elimination Period is the "period of time you must be Disabled before benefits become payable. It is the last time to be satisfied of the following: 1. the first 180 consecutive days of any one period of disability; or 2. with the exception of benefits required by state law, the expiration of any Employer sponsored short term disability benefits or salary continuation program."

4. Mental Illness is defined as "any psychological, behavioral or emotional disorder or ailment of the mind, including physical manifestations of psychological, behavioral or emotional disorders, but excluding demonstrable, structural brain damage."

5. Fibromyalgia is "a form of chronic pain syndrome or soft-tissue rheumatism, which are broad terms used to describe a group of disorders that cause pain and stiffness around the joints and in muscles and bones." Because fibromyalgia "cannot be diagnosed with laboratory tests...the diagnosis is based on a

pression with associated anxiety, 3) Mixed HA's—vascular/tension, 4) GERD, 5) Dystipidemic. On an accompanying Disability "Nerves" Questionnaire, Dr. Fillingane stated: "Linda has major depression with associated anxiety that is very severe and debilitating." He also stated "Linda has been diagnosed with fibromyalgia that causes chronic diffuse pain symptomatology which aggravates her chronic major depression/anxiety." In his concluding remarks, Dr. Fillingane stated that Ms. Dowdy's "fibromyalgia symptoms & major depression are debilitating in & of themselves. She also has bad HA's that are unpredictable. Her husband died 1/18/99 compounding problems with depression. I don't believe that she can maintain any form of dependable employment with all of these problems put together." Ms. Dowdy began receiving social security disability benefits on July 1, 2000.

In August 2000, Ms. Dowdy submitted an application for long-term disability benefits to Hartford, claiming that she had become disabled on January 15, 2000.[6] On her Claimant Questionnaire, Ms. Dowdy described her medical condition as "fibromyalgia / major depression & associated anxiety, mixed HA, GERD dyslipidemia, chronic fatigue." Ms. Dowdy stated that she had "body aches" and "limited mobility." Dr. Fillingane completed an attending physician's statement ("APS") which was submitted along with the claim. The APS gave a primary diagnosis of "fibro-

myalgia; major depression & associated anxiety." Ms. Dowdy's symptoms were described as "difused [sic] body aches; chronic fatigue; difficulty concentrating." The APS stated that Ms. Dowdy was impaired in various activities, including standing (limited to two hours per eight hour work day), walking (one hour out of eight), sitting (three hours out of eight), lifting/carrying (fifteen pounds or occasional lifting), driving (two hours out of eight) and stated that Ms. Dowdy's trouble concentrating made keyboard use or repetitive hand motion difficult. Ms. Dowdy's psychiatric impairment was listed as "Class 4—Unable to engage in stressful situations or in interpersonal relations (marked limitation)." The APS noted that Ms. Dowdy had been referred to a Dr. Byrd for "counseling & relaxation therapy" and also noted that Ms. Dowdy had been hospitalized "for psychiatric care." Dr. Fillingane concluded that he thought Ms. Dowdy's limitations would last her lifetime.

After receiving Ms. Dowdy's claim, Hartford requested and subsequently received Ms. Dowdy's medical records. Hartford then approved Ms. Dowdy's claim by letter dated August 10, 2000. On March 1, 2001, Margaret Cottonreader, a Claim Examiner for Hartford, wrote to Ms. Dowdy informing her that effective July 30, 2001 (when she would had been receiving benefits for one year, from July

careful history and physical examination." According to the American College of Rheumatology's classification of fibromyalgia, "a person has fibromyalgia if he or she has a history of widespread, allover pain of at least three months' duration and abnormal pain sensitivity in at least 11 of 18 specific sites on the body that are called 'tender points.'" *See* Arthritis Foundation, *Fibromyalgia* (2003), *available at http://www.arthritis.org*. Although Hartford takes issue with plaintiff attaching this brochure to her response to its motion for summary judgment, this court is allowed to

look beyond the administrative record at "evidence...that assists...in understanding the medical terminology or practice related to a claim." *Albert v. Life Ins. Co.*, 156 Fed.Appx. 649, 653 (5th Cir.2005) (*citing Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 299 (5th Cir.1999)).

6. Ms. Dowdy had been receiving short-term disability benefits which terminated as of July 31, 2000.

30, 2000), she would have to be meet a different definition of Disabled ("prevented from performing one or more of the Essential Duties of Any Occupation") in order to continue receiving benefits. Ms. Cottonreader informed Ms. Dowdy that Hartford had initiated an investigation in order to make this determination, and they requested that she have her treating physician complete an APS and a Physical Capacities Evaluation Form.

Dr. Fillingane completed a Physical Capacities Evaluation Form dated April 20, 2001, in which he indicated that out of an eight hour day, Ms. Dowdy could sit for three hours, stand for two hours, walk for one hour and drive for two hours, could not climb, reach, crouch or crawl and could only occasionally stoop or kneel. Dr. Fillingane stated that Ms. Dowdy "has difficulty concentrating for long periods of time. She does not need to perform any repetitive motions. She is unable to engage in stressful situations." He concluded that these restrictions were permanent. Dr. Fillingane completed another APS on or about July 24, 2001, in which he stated that Ms. Dowdy's condition was "unchanged." He listed her primary diagnosis as fibromyalgia and major depression with anxiety, and listed her symptoms as diffused body aches, chronic fatigue and difficulty concentrating.

On August 30, 2001, Renae D. Fortson, an Examiner at Hartford, wrote to Ms. Dowdy and informed her that Hartford would be continuing her benefits past July 30, 2001 in order to avoid a financial hardship, but that they were still investigating whether she would, in fact, be eligible for benefits beyond that date. Ms. Dowdy was informed by Ms. Fortson that "[t]he payment of benefits beyond 07/30/01 is not to be construed as an admission of further liability on your claim. We reserve all rights and defenses available to us under the policy, and we waive none." Ms. Fortson requested another APS. Hartford then received an APS dated September 26, 2001 from Dr. Fillingane, stating that Ms. Dowdy's "primary diagnosis" was "major depression [with] anxiety" and "fibromyalgia" and secondary diagnosis was "mixed HA, GERD, Dyslipidemia." He described her symptoms as: "decrease [sic] level of concentration, chronic fatigue, body aches, coping function decreased." Dr. Fillingane stated that Ms. Dowdy's physical functions were "all limited because of difused [sic] body aches and chronic fatigue. No repetitive motions should be performed. She can not engage in any stressful situations." Dr. Fillingane stated that Ms. Dowdy's limitations would be permanent.

At Hartford's request, Dr. George Kazda, Associate Medical Director and a physician with the Medical Advisory Group ("MAG"), then reviewed Ms. Dowdy's medical records. Among other things, Dr. Kazda was asked to determine whether any of Ms. Dowdy's impairments appeared to be "mental/nervous" or due to a physical condition. In addition to reviewing Ms. Dowdy's records, on November 16, 2001, Dr. Kazda spoke with Dr. Fillingane about Ms. Dowdy. Dr. Fillingane indicated to Dr. Kazda that Ms. Dowdy's initial diagnosis of fibromyalgia was made in December of 1999 at the Hattiesburg Clinic,[7] but that during his examinations of her, he had noted the presence of multiple tender points, which in his view were consistent with the diagnosis. Dr. Fillingane told Dr.

---

7. There is no evidence in the record that anyone at Hartford ever attempted to obtain Ms. Dowdy's records from the Hattiesburg Clinic or tried to speak with anyone at the Hattiesburg Clinic about Ms. Dowdy. Nor did Ms. Dowdy herself submit any records from the Hattiesburg Clinic to Hartford in support of her claim.

Kazda that Ms. Dowdy was "doing much better from the physical point of view." Dr. Fillingane also told Dr. Kazda that Ms. Dowdy's current primary condition was psychological/psychiatric in nature, and that there were "no specific physical reasons...that would prevent Ms. Dowdy from returning to occupational activity" (but that her symptoms relating to fibromyalgia would likely relapse, and that an "increase in stress" would adversely affect her physical and psychological conditions).[8]

Dr. Kazda also completed a report, dated November 18, 2001, which he submitted to Hartford. In his report, Dr. Kazda made the following conclusions: "The submitted medical record indicates the predominant aspect of Ms. Dowdy's condition to be psychological, major depression and anxiety"; "The available record does not contain information that in my opinion would support the diagnosis of fibromyalgia"; "Dr. Fillingane indicated that the diagnosis of fibromyalgia was made by rheumatology; however, there are no records of such an evaluation"; "Although Dr. Fillingane indicated findings of 'tender points' on his multiple examinations, I do not see this finding being documented in the medical record"; "Aside from fibromyalgia, there does not appear to be any other physical condition that would preclude return to work."

On January 2, 2002, Karen Speer, a claims examiner in Atlanta, wrote the following: "Agree w/your recommendations to accept TC as information in file supports clmt meets the def of disability and per medical review, we are unable to separate the m/n vs. physical conditions/dx and therefore, cannot impose the 24 month limitations. Recommend to refer to SAM for

continued management." On January 24, 2002, Jane S. Waller, a Senior Examiner at Hartford, stated: "Claim reviewed by specialist. Agree with your recommendations to accept TC as information and file supports claim that meets the definition of disability and per medical review, we are unable to separate the mental versus physical condition diagnosis and therefore, cannot impose the 24 month limitations. Recommend to refer to SAM for continued management." That same day, Ms. Waller wrote to Ms. Dowdy informing her that Hartford had determined that based on its review of her file, she met the policy definition of Disability and would continue to qualify for benefits on and after July 30, 2001. Ms. Dowdy was notified that Hartford would periodically request continued proof of disability from her.

Thereafter, Hartford continued to investigate Ms. Dowdy's ongoing eligibility for long-terms disability benefits—specifically, whether Ms. Dowdy's claim was subject to the twenty-four month limitation for Mental Illness. On July 15, 2002, Ms. Dowdy's file was reassigned to Joe Mancini, a Specialist with Hartford. That day, Mr. Mancini wrote to Ms. Dowdy requesting additional information including an APS from her doctor and all medical records from 1/1/01 to the present. Ms. Dowdy completed a Claimant Questionnaire on July 20, 2002. She described her current medical conditions as "depression, anxiety, chronic fatigue, fibromyalgia, and migraine headaches."

Dr. Fillingane completed another APS on August 13, 2002, again stating that Ms. Dowdy's primary diagnosis was "major depression & anxiety/fibromyalgia." Dr. Fillingane stated that Ms. Dowdy "can not

---

**8.** Dr. Kazda sent Dr. Fillingane a letter dated November 18, 2001, summarizing the substance of their conversation, and asking Dr. Fillingane to let him know if he disagreed with anything or wanted to provide any additional information. Dr. Fillingane never responded to the letter.

engage in any stressful situations. She can not perform any repetitive motions. She is limited in all areas listed because of difused [sic] body aches & chronic fatigue." He indicated that Ms. Dowdy's limitations would last permanently and that her condition was unchanged from his previous APS. Dr. Fillingane also completed a psychiatric APS on August 19, 2002, diagnosing Ms. Dowdy with Axis I—Fibromyalgia Syndrome; Axis II—Major Depression; and Axis II—GERD, leg pain, and mixed headaches—vascular/tension. Her symptoms were described as: leg pain, vague body aches, introverted behavior, difficulty concentrating and intermittent nausea/vomiting/diarrhea. Dr. Fillingane stated that "the complex nature of this patient's condition makes it unlikely she will become functional again."

On September 16, 2002, Mr. Mancini conducted a review of Ms. Dowdy's claim. He reviewed various materials in her file and noted that there was an internal difference of opinion at Hartford about Ms. Dowdy's claim: "MAG concluded after the review and call to Dr. Fillingane that her impairments were primarily psyche related. The file went to BHCM and they concluded after review and discussion with...Dr. Fillingane, that the physical and mental could not be separated and felt that she was disabled both. The examiner/specialist concluded to continue paying under physical based on the BHCM review as we could not distinguish the physical vs. m & n." The following day, Mr. Mancini interviewed Ms. Dowdy via telephone. Ms. Dowdy told Mr. Mancini that "she has a lot of muscle/joint pains and some days can't even function. She said right now she can't even move her hands and fingers. She has a hard time walking or standing. She has mostly bad days where she needs to stay in bed or rest." Ms. Dowdy said she felt her low energy and fatigue were caused by depression, although she also said that she felt her "psyche problems, fibro and CFS are disabling within themselves." At an October 30, 2002 Focus Review Claims Discussion and Team Meeting involving Mr. Mancini among others at Hartford, Ms. Dowdy's claim was discussed and it was noted that "BHCM states not possible to separate psych and physical condition." It was recommended that updated medical records be obtained "to determine if one year after last review psych or physical is primary."

In November 2002, Hartford sought a referral for an independent psychological evaluation of Ms. Dowdy from PsyBar, LLC. The purpose of this evaluation was to answer the question: "Is her depression and anxiety secondary to the fibromyalgia or are the fibromyalgia symptoms secondary to the depression and anxiety?" PsyBar arranged for Ms. Dowdy to have an evaluation appointment with William Gasperini, a clinical psychologist, on December 4, 2002, at Hartford's expense. Dr. Gasperini conducted an interview of Ms. Dowdy, reviewed her medical records provided by Hartford and administered a psychological test. Dr. Gasperini then prepared a report, dated December 4, 2002, in which he diagnosed Ms. Dowdy with "major depression" and concluded that Ms. Dowdy's symptoms of depression "do not appear to be the result of Fibromyalgia, but appear to be a primary Depressive Disorder. Similarly, her symptoms of Fibromyalgia appear to be a primary medical condition and do not seem to be caused by her depression. The history suggests that she was suffering from Fibromyalgia for a period of time before she had her first episode of Major Depression."

On January 8, 2003, Mr. Mancini wrote to Dr. Fillingane, enclosing Dr. Gasparinni's Psychological Evaluation. Hartford asked Dr. Fillingane to review the report and provide his current opinion as to

whether he believed Ms. Dowdy's primary condition was still psychological/psychiatric in nature, as he had expressed in his November 18, 2001 phone conversation with Dr. Kazda. On February 19, 2003, Dr. Fillingane called Mr. Mancini and gave him a verbal opinion during that phone call, which Mr. Mancini wrote down. Dr. Fillingane stated that "he has seen Ms. Dowdy for the past five years and believes her disabling condition is 50/50 fibromyalgia/CFS (Chronic Fatigue Syndrome) and psychiatric. He said he believes and agrees with IME psych report (of Dr. Gasparinni) that she has a disabling psych condition but also believes physically she is disabled from the FMS/CFS by itself. He said when she does any activity like shopping, she is laid up for a couple of days. If she returns to work, she will be able to work one day and then will be laid up the next. So, in summary, his opinion is that she is disabled from both conditions within themselves. I told him that I would document this conversation and thanked him for his opinion."

Mr. Mancini referred Ms. Dowdy's claim to the University Disability Consortium ("UDC")[9] on February 24, 2003 and requested that a rheumatologist and a psychiatrist review her file and consult with Dr. Fillingane to determine, among other things, "if [her] disabling condition is primarily psychological in nature." Dr. Noreen F.B. Ferante, a rheumatologist, and Dr. Andrew O. Brown, a psychiatrist, reviewed Ms. Dowdy's case.

On March 24, 2003, Dr. Ferrante wrote to Dr. Fillingane summarizing their conversation about Ms. Dowdy. According to this letter, Dr. Fillingane told Dr. Ferrante that Ms. Dowdy's initial diagnosis of fibromyalgia was made by a rheumatologist and that he was "fully committed" that this diagnosis was correct. Dr. Fillingane said that he first examined Ms. Dowdy, she had 14 of the 18 tender points used to diagnose fibromyalgia. Dr. Fillingane told Dr. Ferrante that Ms. Dowdy was "almost completely house-bound by her depression." Dr. Fillingane stated that Ms. Dowdy was no longer complaining of much pain and that the pain she did have tended to be after activity only, not after inactivity. "Her greatest problem (other than severe depression) is profound fatigue." Dr. Fillingane stated that he did not think Ms. Dowdy could return to any type of employment because of her severe depression and fatigue. Dr. Fillingane signed the letter on April 12, 3003, indicating his agreement with its contents.

Dr. Ferrante then completed a Medical Record Review dated March 24, 2003. Dr. Ferrante noted that although Ms. Dowdy's medical "records are large in number, they are extremely scant both in terms of the history they provide and any documentation of findings on physical examination." Dr. Ferrante noted that none of Dr. Fillingane's notes documented the presence of specific tender points nor did they attempt to describe or quantify Ms. Dowdy's level of pain. Dr. Ferrante did state that if it was correct that at Dr. Fillingane's first examination of Ms. Dowdy she had 14 of the 18 tender points, then the fibromyalgia diagnosis was probably correct. However, Dr. Ferrante was "uncertain" about the diagnosis because Ms. Dowdy had pain only with activity, not with inactivity (another symptom of fibromyalgia). Dr. Ferrante was "not convinced [Ms. Dowdy] has any physical impairment" and felt that "her *primary* impairment is psychiatric" (emphasis in original). Dr. Ferrante concluded that "[i]f one were not to consider the psychiatric limitations, then it is proba-

9. UDC is an independent company that contracts with practicing specialists to assess medical evidence and determine patients' functionality.

bly fair to say that the claimant would be capable of sedentary work with frequent positional change." (emphasis in original).

On March 24, 2003, Dr. Brown wrote to Dr. Fillingane summarizing their discussion about Ms. Dowdy. In the letter, Dr. Brown wrote that Dr. Fillingane had noted some progress in treatment recently. Dr. Fillingane told Dr. Brown that he had consistently recommended that Ms. Dowdy see a psychiatrist but that she was reluctant. Dr. Fillingane also referenced Ms. Dowdy's fibromyalgia and chronic fatigue syndrome, and "noted that if [Ms. Dowdy] undertakes any effort or sustained activity, she will pay for it later...if [Ms. Dowdy] works for one day, then she will be incapacitated for the subsequent three or four days due to even worse fatigue." Dr. Fillingane signed the letter on April 12, 2003 indicating his agreement with its contents.

Dr. Brown submitted a report to Hartford dated March 24, 2003, in which he stated Ms. Dowdy's "feelings of resignation which have accompanied [her major depressive disorder] have interfered with the resumption of work capacity." Dr. Brown stated that he "would defer to Dr. Ferrante with regard to the severity of the insured's co-morbid medical conditions" but concluded that "aggressive psychopharmocologic" and "psychotherapeutic intervention" would be effective in treating her depression and chronic fatigue syndrome and "should ultimately involve resumption of [her] functional capacity." Dr. Brown noted, however, that Ms. Dowdy would "likely explicitly or passively resist the implementation of any treatment whose explicit goals include resumption of her functional capacity."

On April 4, 2003, Marvin Bryant at Hartford completed an Employability Analysis Report on Ms. Dowdy, based on information from Drs. Ferrante and Brown, which concluded that Ms. Dowdy could perform semi-skilled sedentary work, and identified the following reasonable occupations: personnel clerk, sorter, identification clerk, timekeeper and telephone clerk-telegraph office.

On April 8, 2003, Mr. Mancini notified Ms. Dowdy that Hartford had completed its review of her claim and had determined that it was payable under the Mental Illness and Substance Abuse Benefits provision, effective April 1, 2003, and was therefore subject to the 24-month limitation (unless she was confined to a hospital). In the letter, Mr. Mancini explained that all the records in Ms. Dowdy's were reviewed, and that it was Hartford's conclusion that "the weight of the medical evidence supports that [Ms. Dowdy's] disabling condition is Major Depression Recurrent, Severe with Psychotic Features," and that "[t]he medical records...don't support the criteria for diagnoses of Fibromyalgia or Chronic Fatigue Syndrome, or indicate that these conditions are disabling. The weight of the medical supports that your disabling condition is of a psychological nature."

On October 6, 2003, Ms. Dowdy's attorney, Robin Roberts, wrote to Hartford informing them that Ms. Dowdy was appealing its April 8, 2003 decision limiting her benefits to two years. Mr. Roberts requested a copy of Ms. Dowdy's files so that he could have an expert review them and submit additional detail regarding her condition. In response, Hartford sent Mr. Roberts a copy of Ms. Dowdy's file on October 15, 2003. Also, by separate letter dated October 15, 2003, Hartford notified Mr. Roberts that it would await additional appeal information from him until January 6, 2004, at which time it would begin its appeal review. When no further information was received, Hartford notified Ms. Dowdy's attorney on January 7, 2004 that they were beginning their appeal review.

The appeal was assigned to Corey M. Welch, an Appeal Specialist at Hartford. On January 13, 2004, Mr. Welch wrote to Ms. Dowdy's attorney, informing him that Hartford had completed its appeal review of Ms. Dowdy's claim and had determined that the decision to limit her disability benefit payments under the Mental Illness provision was correct. Hartford concluded that the "weight of medical evidence supports that Ms. Dowdy has a psychiatric disability, but that in absence of her psychiatric problems, she would be physically capable of sustaining sedentary work activity."

On September 7, 2004, Hartford reminded plaintiff of her benefits termination date and asked her to submit medical documentation to support a claim for a physical disability, if she was currently receiving treatment for any independently disabling physical condition. Plaintiff did not provide any such documentation. Hartford stopped paying Ms. Dowdy long-term disability benefits as of March 31, 2005. This lawsuit ensued.

### SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is to be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record which it believes demonstrates the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106

S.Ct. 2505, 91 L.Ed.2d 202 (1986); Williams v. Adams, 836 F.2d 958, 960 (5th Cir.1988). The moving party, however, need not negate the elements of the non-movant's case. See Wallace v. Texas Tech Univ., 80 F.3d 1042, 1047 (5th Cir.1996) (citing Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994)).

Once the moving party satisfies its initial burden, the non-movant may not rest on the pleadings, but must "identify specific evidence in the ... record demonstrating that there is a material fact issue concerning the essential elements of its case." Douglass v. United Servs. Auto Ass'n, 79 F.3d 1415, 1429 (5th Cir.1996) (citation omitted); see also Celotex, 477 U.S. at 322–23, 106 S.Ct. 2548; Anderson, 477 U.S. at 257, 106 S.Ct. 2505. "The moving party need not support its motion with affidavits or other evidence, but to defeat a motion for summary judgment the nonmovant must present evidence sufficient to establish the existence of each element of his claim as to which he will have the burden of proof at trial." Pavone v. Mississippi Riverboat Amusement Corp., 52 F.3d 560, 565 (5th Cir.1995) (citation omitted).

In analyzing a motion for summary judgment, all evidence must be "construed in the light most favorable to the nonmoving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." Williams v. Time Warner Operation, Inc., 98 F.3d 179, 181 (5th Cir.1996) (citation omitted). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor." Palmer v. BRG, Inc., 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (quoting Anderson, 477 U.S. at 255, 106 S.Ct. 2505). Nevertheless, "conclusory allegations, speculation and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden."

*Douglass*, 79 F.3d at 1429 (citation omitted). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "In such situations, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23, 106 S.Ct. 2548.

## ANALYSIS

### Applicability of ERISA

The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, exclusively governs (with certain exceptions not applicable here) "any employee benefit plan ... established or maintained ... by any employer engaged in commerce or in any industry affecting commerce." 29 U.S.C. § 1003; *see also Hansen v. Continental Ins. Co.*, 940 F.2d 971, 976 (5th Cir.1991). An "employee welfare benefit plan"[10] is defined under ERISA as follows: "Any plan, fund or program ... established or maintained by an employer ... to the extent that such plan, fund or program was established or maintained by an employer ... for the purpose of providing to its participants or their beneficiaries ... benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1). The Plan in this case was established and maintained by plaintiff's employer, who is engaged in interstate commerce, for the purpose of providing its employees benefits in the event of long-term disability. The Policy sets forth the benefits available, the intended participants and beneficiaries,

and the appropriate procedures for submitting claims for benefits. The court finds (and the parties agree) that the Plan is an employee welfare benefit plan subject to ERISA. *See Meredith v. Time Ins. Co.*, 980 F.2d 352, 355 (5th Cir.1993); *Hansen*, 940 F.2d at 977; *Mem'l Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 240, 242 (5th Cir.1990), *reh'g denied*, 1990 U.S.App. LEXIS 13227 (5th Cir. July 16, 1990); *Davis v. AIG Life Ins.*, 945 F.Supp. 961, 966 (S.D.Miss.1995).

Where a participant seeks to recover benefits under an employee welfare benefit plan, the exclusive remedy is provided by ERISA's civil enforcement mechanism. 29 U.S.C. § 1132; *see also Hudson v. Aetna Ins. Co.*, 2006 WL 463129, at *4 (S.D.Miss. Feb. 24, 2006) (*citing Hansen*, 940 F.2d at 979). 29 U.S.C. § 1132(a) provides, in pertinent part, as follows: "A civil action may be brought—(1) by a participant or beneficiary—(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

### Standard of Review Under ERISA

██ Where a "benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits of to construe the terms of the plan," this court is limited to reviewing its decisions to limit or deny benefits under an abuse of discretion standard, rather than *de novo*. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111–15, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also Albert v. Life Ins. Co. of North America*, 156 Fed. Appx. 649, 651 (5th Cir.2005) (citations omitted); *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 269 (5th Cir.2004); *cert.*

---

**10.** Under ERISA, the term "employee benefit plan" or "plan" means "an employee welfare benefit plan." 29 U.S.C. § 1002(3).

*denied,* 545 U.S. 1128, 125 S.Ct. 2941, 162 L.Ed.2d 867 (2005); *Vega v. Nat'l Life Ins. Serv., Inc.,* 188 F.3d 287, 295 (5th Cir. 1999).[11] The Plan and Policy give Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy," and therefore this court must apply an abuse of discretion standard in reviewing Hartford's decision to limit Ms. Dowdy's long-term disability benefits to the mental illness provision of the Policy. This standard of review applies to an initial denial of benefits as well as to a termination of benefits after an initial determination of eligibility. *Matney v. Hartford Life & Accident Ins. Co.,* 172 Fed.Appx. 571, 572, 2006 WL 775129 (5th Cir.2006) (*citing Ellis,* 394 F.3d at 274).

■ Under the abuse of discretion standard, the court must uphold the administrator's decision if it is supported by substantial evidence and is not arbitrary and capricious. *Ellis,* 394 F.3d at 273; *Matney,* 172 Fed.Appx. at 572; *Albert,* 156 Fed.Appx. at 651(*citing Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.,* 168 F.3d 211, 215 (5th Cir.1999)). "Substantial evidence" has been defined as "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ellis,* 394 F.3d at 269 (citations omitted). In other words, the administrator's decision but must "fall[ ] somewhere on a continuum of reasonableness-even if on the low end." *Vega,* 188 F.3d at

297. Nevertheless, "[a]n administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial.' " *Matney,* 172 Fed.Appx. at 572 (citations omitted); *see also Lewis v. Unum Life Ins. Co.,* 188 Fed.Appx. 259, 263 (5th Cir.2006). "A decision is arbitrary if there is no rational connection between the known or found facts and the evidence in the record." *Matney,* 172 Fed.Appx. at 572. It is important to keep in mind that "[t]he law requires only that substantial evidence support a plan fiduciary's decisions...not that substantial evidence (or, for that matter, even a preponderance) exists to support the employee's claim of disability." *Ellis,* 394 F.3d at 273 (citations omitted).

Plaintiff has the burden of proving that Hartford's decision constituted an abuse of discretion, and that she is entitled to benefits beyond what Hartford has paid. *Kirschenheuter v. Bd. of Trustees,* 341 F.Supp.2d 624, 628 (S.D.Miss.2004); *Haley v. Metropolitan Life Ins. Co.,* 189 F.Supp.2d 567, 573 (S.D.Miss.2001). In applying the abuse of discretion standard, the court is limited to the administrative record which "consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Vega,* 188 F.3d at 300; *see also Matney,* 172 Fed.Appx. at 573; *Lewis v. CNA Group Life Assurance Co.,* 414 F.Supp.2d 652, 654–55 (S.D.Miss. 2006).

---

**11.** Although Sunbeam is listed as the Plan administrator, under the Policy Hartford is expressly given "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." Therefore, Hartford is a "fiduciary" under ERISA because it is vested with "discretionary authority or discretionary responsibility in the administration of the plan." *See* 29 U.S.C. § 1002(21)(A)(iii); *Ellis,* 394 F.3d at 266 n. 3. As a fiduciary vested with discretionary authority to determine eligibility for benefits under the Plan or to interpret the Plan's provision, Hartford's determinations are reviewed under the abuse of discretion standard. *Ellis,* 394 F.3d at 266 n. 3, 269.

A potential conflict of interest is also a factor in the abuse of discretion inquiry. *Matney*, 172 Fed.Appx. at 572–73. In this case, because Hartford insures the Plan and is also solely responsible for making benefits determinations, there is a potential conflict of interest because Hartford "potentially benefits from every denied claim." *Ellis*, 394 F.3d at 265; *see also Unum*, 188 Fed.Appx. at 262. Therefore, the court must apply a "sliding scale standard" in reviewing Hartford's decision, meaning that the court must "give[ ] less deference to the administrator in proportion to the administrator's apparent conflict," and is "less likely to make forgiving inferences when confronted with a record that arguably does not support the administrator's decision." *Vega*, 188 F.3d at 296, 299; *see also Matney* at 572–73. However, as there is no other evidence of a conflict other than Hartford's position as the insurer and also as the one determining eligibility for benefits, the court will afford Hartford's decision "only a modicum less deference" than it otherwise would. *Matney*, 172 Fed.Appx. at 573 (*citing Vega*, 188 F.3d at 301).

*Application of Abuse of Discretion Standard*

■ As discussed below, the court finds no abuse of discretion in Hartford's decision to terminate Ms. Dowdy's benefits, as it finds that the decision was neither arbitrary nor capricious, and that it was supported by substantial evidence.

Plaintiff argues that Hartford "initially and correctly" decided that Ms. Dowdy's disability was physical and began paying benefits, but that "[l]ater, when higher-ups at the Hartford began looking for ways to save money, they had their own internal experts and paid consultants selectively

review Ms. Dowdy's records and come up with a diagnosis attempting to claim that Ms. Dowdy's disability all of a sudden was mental and not physical." However, the record reveals that Hartford initially determined that Ms. Dowdy was, in fact, disabled within the meaning of the policy (a determination that Hartford did not later change). What Hartford continued to examine was whether Ms. Dowdy's disability was caused by a mental/psychological condition, as opposed to a physical condition, which would subject it to the two-year limitation of the Mental Illness provision. The record reflects that Hartford went to great efforts to conduct this analysis, resorting to outside experts after it became clear that there was a difference of opinion internally. Contrary to plaintiff's interpretation, the fact that Hartford initially paid benefits but later stopped paying benefits "supports a finding of good faith on [Hartford's] part" *Ellis*, 394 F.3d at 273.[12] And, of course, the fact that Hartford initially granted benefits to Ms. Dowdy does not estop Hartford from terminating those benefits if substantial evidence supported its decision. *Id.*

The record reveals that Hartford engaged in an extensive review of Ms. Dowdy's file over the course of several years, ultimately concluding based on the evidence in the record that her benefits were subject to the Mental Illness provision of the Policy. Among other things, Hartford relied on the following, as set forth in its April 8, 2003 letter to Ms. Dowdy: several APSs submitted by Dr. Fillingane providing diagnoses of major depression with associated anxiety and fibromyalgia; the opinion of Dr. Kazda, an independent physician at MAG who reviewed Ms. Dowdy's records and spoke with Dr. Fillingane, and

---

**12.** Indeed, Hartford paid benefits for a total of five years, further demonstrating its good faith.

concluded that the medical record did not support the diagnosis of fibromyalgia and that the predominant aspect of Ms. Dowdy's condition was psychological, not physical; the opinion of Dr. Ferrante, an independent rheumatologist at the UDC who also reviewed Ms. Dowdy's records and spoke with Dr. Fillingane, and concluded that there was no documentation of any findings on specific tender points to confirm the diagnosis of fibromyalgia, that other factors in the record made her question the diagnosis, and that Ms. Dowdy's primary impairment was psychiatric; the opinion of Dr. Gasparinni, an independent clinical psychologist who diagnosed Ms. Dowdy with major depression with psychosis; the opinion of Dr. Brown, an independent psychiatrist at the UDC who also reviewed Ms. Dowdy's medical records and spoke with her treating physician, Dr. Fillingane, and concluded that Ms. Dowdy had major depressive disorder which was interfering with her ability or desire to return to work;[13] and the Employability Analysis Report conducted by Hartford which determined that Ms. Dowdy was qualified to perform a number of sedentary occupations.

It is hardly the case, as plaintiff alleges, that Hartford disregarded Dr. Fillingane's opinion. Rather, Hartford relied on Dr. Fillingane's statement to Dr. Kazda on November 16, 2001 that Ms. Dowdy's primary condition was psychological/psychiatric in nature, and that there were no physical reason why she could not return to work. Although Dr. Fillingane apparently later changed his opinion, stating to Mr. Mancini on February 19, 2003 that he believed Ms. Dowdy's disabling condition was "50/50 fibromyalgia/chronic fatigue syndrome and psychiatric," and that he believed that Ms. Dowdy was physically disabled from fibromyalgia/chronic fatigue syndrome, Hartford was entitled to rely on Dr. Fillingane's original opinion in making its benefit determination. *See Gooden v. Provident Life & Accident Ins. Co.*, 250 F.3d 329, 333–34 (5th Cir.2001); *Schultz v. Progressive Life, Health & Disability Benefits Plan*, 380 F.Supp.2d 780, 787 (S.D.Miss.2005) (both holding that administrator does not abuse its discretion when relying on physician's original opinion, where there is no evidence or explanation as to change in opinion). At any rate, the Supreme Court has held that under ERISA, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834,

---

13. Plaintiff argues that many of the doctors and experts Hartford relied on (other than Dr. Fillingane) were not "Daubert qualified" to render their opinions. However, as Hartford argues, the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to which plaintiff makes reference, is inapplicable to this case. *Daubert* governs the admissibility of expert opinions at trial, not the qualifications of physicians relied upon by administrators in making benefits decisions. Plaintiff has provided no authority for her position that *Daubert* should apply to this case. Indeed, courts that have considered this issue have held that *Daubert* standards are inapplicable to a court's review of the administrative record in an ERISA case. *See, e.g., Wyatt v. AMEC Choices Benefits Program Long Term Disability Insurance Plan*, 2005 WL 1186114, at *5 (S.D.Tex. May 19, 2005); *Hufford v. Harris Corp.*, 322 F.Supp.2d 1345, 1358 (M.D.Fla.2004). The reports of the various physicians in this case were made a part of the administrative record and the only question for this court is whether there is substantial evidence in the record to support Hartford's determination, not whether the physicians were qualified under *Daubert*. *See Wyatt*, 2005 WL 1186114, at *5.

123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Indeed, numerous courts have upheld administrators' decisions where the administrator chose to rely upon medical opinions from doctors other than treating physicians, even from doctors selected by the administrator to review the claim. *See, e.g., Chandler v. Hartford Life,* 178 Fed. Appx. 365, 369–70, 2006 WL 1209363, at *4 (5th Cir.2006); *Vercher v. Alexander & Alexander, Inc.,* 379 F.3d 222, 231–33 (5th Cir.2004); *Dubose v. Prudential Ins. Co.,* 85 Fed.Appx. 371, 372 (5th Cir.2003); *Sweatman v. Comm'l Union Ins. Co.,* 39 F.3d 594, 602–03 (5th Cir.1994); *Noble v. Ingalls Shipbuilding,* 2006 WL 839519, at *4 (S.D.Miss. Mar.29, 2006).

Plaintiff argues that Dr. Ferrante and Hartford ignored Dr. Fillingane's assertion that on his initial exam Ms. Dowdy was experiencing pain at 14 of the 18 tender points, and that Ms. Dowdy had been previously diagnosed with fibromyalgia at the Hattiesburg Clinic. Plaintiff further argues that the failure to obtain her medical records from the Hattiesburg Clinic "is unprofessional and evidence of bias on the part of Dr. Ferrante and the Hartford." However, as noted by Dr. Ferrante as well as by Dr. Kazda, there was a lack of objective physical findings in the record showing that plaintiff was disabled by a physical condition. As Dr. Fillingane explained to both doctors, plaintiff's diagnosis of fibromyalgia was made by a rheumatologist at Hattiesburg Clinic, and Dr. Fillingane merely agreed with that diagnosis. However, that initial diagnosis was not a part of the record before Hartford. As for the failure to obtain Ms. Dowdy's medical records from the Hattiesburg Clinic, this does not establish that Hartford abused its discretion. In *CNA,* plaintiff argued that the administrator (his insurance company) abused its discretion by failing to make a good faith effort to obtain his medical records. The court re-

jected that argument, stating that "it is not the administrator's burden to prove that it conducted a reasonable investigation but rather it is the claimant's duty to provide the administrator with evidence he considers pertinent to his claim." 414 F.Supp.2d at 655. In so holding, the court cited to the Fifth Circuit's decision in *Vega,* 188 F.3d at 298, where the court stated:

> There is no justifiable basis for placing the burden solely on the administrator to generate evidence relevant to deciding the claim, which may or may not be available to it, or which may be more readily available to the claimant... Instead, we focus on whether the record adequately supports the administrator's decision. In many cases, this approach will reach the same result as one that focuses on whether the administrator has reasonably investigated the claim. The advantage to focusing on the adequacy of the record, however, is that it (1) prohibits the district court from engaging in additional fact-finding and (2) encourages both parties properly to assemble the evidence that best supports their case at the administrator's level.

Plaintiff also argues that Hartford refused to recognize the significance of Dr. Gasparinni's opinion that Ms. Dowdy appeared to be suffering from two distinct conditions, depression/anxiety on the one hand, and fibromyalgia on the other hand, neither of whom seem to have caused the other, and that "[t]he history suggests that she was suffering from Fibromyalgia for a period of time before she had her first episode of Major Depression." However, these statements do not establish that Ms. Dowdy was disabled by these conditions or that her condition was not primarily mental/psychological. And even if they did, this would simply mean that there is a dispute in the record among medical professionals, which is not enough for this court to conclude that Hartford lacked

substantial evidence to support its determination.

Plaintiff obviously disagrees with Hartford's decision to limit her long-term disability benefits to the two-year Mental Illness provision of the Policy. And the court notes that there is certainly room within the administrative record for a reasonable dispute about this. However, it is not for this court to second-guess Hartford's decision. Rather, this court must defer to Hartford unless it abused its discretion or its decision is not supported by substantial evidence. As discussed above, the court finds that Hartford did not abuse its discretion and its decision was supported by substantial evidence. Therefore, because Hartford has paid plaintiff the maximum amount of benefits to which she is entitled under the Policy, the court finds that Hartford is entitled to summary judgment and plaintiff's complaint is dismissed with prejudice.

IT IS, THEREFORE, ORDERED AND ADJUDGED that Hartford's motion for summary judgment [# 25] is granted and plaintiff's complaint is dismissed with prejudice.